UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARINA KING, | Case No. 16-cv-06643-KAW |
| Plaintiff, | |
| v. | **ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| NANCY A. BERRYHILL, | |
| Defendant. | Re: Dkt. Nos. 18, 19 |

Plaintiff Sarina Tiffany Ann King seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Commissioner's final decision, and the remand of this case for benefits or further proceedings. Pending before the Court is Plaintiff's motion for summary judgment and Defendant's cross-motion for summary judgment. Having considered the papers filed by the parties, and for the reasons set forth below, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross-motion for summary judgment.

## I. BACKGROUND

On July 9, 2013, Plaintiff applied for Title XVI benefits. (Administrative Record ("AR") 165.) The Social Security Administration ("SSA") denied Plaintiff's application initially and on reconsideration. (AR 105, 111-13.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 136.) The assigned ALJ held a hearing on March 13, 2015. (AR 26.)

The ALJ discussed a number of different medical opinions in rendering a decision. In June 2008, when Plaintiff was 14-years old, Psychologist Bettye Davis conducted a psycho-educational evaluation report to determine if Plaintiff continued to qualify for special education services. (AR 384.) Dr. Davis performed a Differential Abilities Scales ("DAS") School Achievement Test. (AR 387.) The DAS yields several scores: the General Conceptual Ability ("GCA") score, which

focuses on reasoning and conceptual abilities; the Verbal Cluster score, which measures verbal knowledge, reasoning, and the ability to use verbal concepts; the Nonverbal Reasoning Cluster score, which measures inductive reasoning; and the Spatial Cluster score, which measures the ability to orient objects in space, visualize objects, think analytically, and attend to visual detail. (AR 388.) Plaintiff received a Verbal Score of 63 (1st percentile, very low), a Nonverbal Reasoning score of 59 (0th percentile, very low), and a Spatial Cluster score of 50 (0th percentile, very low), resulting in a GCA score of 52 (very low).

In September 2012, in connection with a prior social security application that was denied, Plaintiff was examined by Ute Kollath, PhD. (AR 406.) Plaintiff arrived on-time and had travelled by bus. She was friendly and cooperative, made good eye contact, and interacted appropriately with the examiner and office staff. (*Id.*) Plaintiff stated that she enjoyed socializing with her family and friends, was independent for basic daily life activities, did not need help with preparing meals, was unable to drive, and was unable to make change at the store. (AR 406-07.)

Dr. Kollath performed a Folstein Mini Mental State Exam, Wechsler Adult Intelligence Scale, Wechsler Memory Scale, and Trailmaking Test. (AR 408.) Dr. Kollath found that Plaintiff applied suboptimal effort to the mental status exam. (AR 407.) Dr. Kollath considered the test results "to be an unreliable representation of the claimant's current psychological functioning. Claimant's answers to some questions on the Information Subtest are congruent with what is seen in a malingering profile. Claimant replied that 'Wednesday' is the day after Monday and that [t]he shape of most balls is 'square.'" (AR 408.) Dr. Kollath observed that Plaintiff had no difficulty following simple and moderately complex directions, and that she "presented with variable motivation and results cannot be considered as a reasonably valid or reliable estimate of her level of functioning." (*Id.*) Dr. Kollath assigned a GAF score of 64, and found that Plaintiff was unimpaired in her ability to follow simple directions, maintain adequate pace or persistence to perform one or two step simple repetitive tasks, maintain adequate attention/concentration, adapt to changes in routine, withstand the stress of a routine workday, interact appropriately with co-workers and supervisors and the public on a regular basis, and adapt to changes and hazards and stressors in a workplace setting. (AR 409.) Dr. Kollath was unable to assess Plaintiff's ability to

follow complex/detailed instructions or perform complex tasks due to decreased effort.

Also, in September 2012, Plaintiff was examined by Barbara Vasser, M.S. (AR 411.) Dr. Vasser observed Plaintiff as being polite and cooperative, but that she was unable to complete the patient information sheet, read most questions, or spell words to answer known information. (AR 412.) Plaintiff required the maximum allowable repetition of test instructions and items, missed most items that did not permit repetition, had several "No Response" efforts, demonstrated limited vocabulary, was unable to read test stimuli at the 8-year level, was unable to identify more than two out of twelve shapes, and could only spell one out of four words. Dr. Vasser administered the CELF-R, which put Plaintiff in the 1st percentile for receptive language, and 1st and 5th percentile for expressive language. (AR 412-13.) Dr. Vasser also performed the Clinical Evaluation of the Language Fundamentals-3 (CELF), and found that Plaintiff achieved a Total Language Score equivalent to a person of 8 years and 7 months, indicating severe receptive/expressive language delays. (AR 415.) The GFTA resulted in a finding that Plaintiff's speech was 85% intelligible, although dialectical errors were observed. Ultimately, Dr. Vasser found it likely that there was a speech and/or language disorder that would affect Plaintiff's learning and/or social development, and that Plaintiff presented with "severe receptive/expressive language delays." (AR 416.)

In October 2013, in connection with her Title XVI benefits application, Plaintiff was examined by John Prosise, PhD. (AR 432-34.) Dr. Prosise observed Plaintiff as being adequately groomed, attentive, communicative, and good-natured. (AR 432.) Plaintiff's oral affect seemed physically childlike, but her comprehension and interaction were age-appropriate. Plaintiff responded cooperatively to informal prompts, was alert and oriented during her interview, and understood questions. Dr. Prosise found, however, that Plaintiff "failed to comply with testing," noting that her "[f]und of information was implausibly limited, including her maintaining that Martin Luther King, Jr. was a U.S. President." (*Id.*) When reviewing Plaintiff's daily activities, Dr. Prosise found that Plaintiff's "endorsements of her pragmatic capabilities underreported them. Discussion revealed that her limited participation in several of the rejected activities may represent matters of taste or lifestyle and admittedly not fixed limitations of capability." (AR 433.)

Dr. Prosise performed several tests, including WAIS-IV, WMS-IV, Trailmaking Test, and

Rey-15. (AR 432.) Dr. Prosise concluded that the results of the WAIS-IV and Full Scale IQ results were "due to willful item rejections and naively inventive errors," and that the "WMS-IV Memory Indices were comparably Deficient and likewise invalid." (AR 433.) Dr. Prosise observed that Plaintiff "was unable to recite the days of the week; name the shape of a ball; or count the number of minutes in one hour. In questions to test the limits of her abilities following implausible item failures, she generally stood by her errors or escalated them blatantly, with discreet amusement." (*Id.*) Thus, the scores were "poor representations of her demonstrated abilities." (*Id.*) Similarly, Dr. Prosise stated that Plaintiff quit the Trailmaking Test B "following ten random errors," and that administration of "the Rey-15 returned the extraordinary score of 3 (of 15), which showed transparently willful, provocative errors." (*Id.*)

Based on these results, Dr. Prosise diagnosed Plaintiff with depressive disorder and pervasive malingering, and assigned a GAF score of 60. (AR 434.) Dr. Prosise concluded that the assessment "provided no reliable evidence of cognitive deficits." (*Id.*) Dr. Prosise further found that Plaintiff's "initiation into employment [wa]s deferred . . . for situational reasons, including schooling and parenting." (*Id.*) Moreover, her work opportunities were "probably complicated by the trait-like misleading stance she adopted (and quietly enjoyed) here, in which she portrayed herself with improvised cognitive impairment. She is not grossly cognitively impaired, however." (*Id.*) Dr. Prosise concluded that Plaintiff was unimpaired in performing simple instructions, simple tasks and decisions, complex instructions, and social interactions. Plaintiff was minimally impaired in her psychological adaptability, in that she had the ability to adjust to age-appropriate workplace requirements, hazards, and changes of routine. Dr. Prosise did not assess Plaintiff's ability to perform complex tasks and decisions, noting that she carried out brief, complex instructions, but that the authorized procedures did not identify the limits of her abilities due to malingering. (*Id.*)

Finally, in June 2014, Plaintiff was examined by Jon Bathori, Psy.D., in connection with determining whether Plaintiff met the Regional Center East Bay's criteria for services and to reevaluate Plaintiff's competency to stand trial. (AR 662.) Dr. Bathori observed that Plaintiff was dressed appropriately, had good hygiene, and was polite and cooperative. (AR 663.) Dr. Bathori

4

noted that Plaintiff had "a markedly childish demeanor," and that while normatively responsive to questions, appeared to be exhausted such that answering required "unusual effort on her part." (*Id.*) Dr. Bathori performed a WAIS-IV, which produced a Full Scale IQ ("FISQ") of 47, which fell into the category of "Extremely Low/Lower Extreme" and was equivalent to the .5th percentile. (AR 664.) Dr. Bathori believed the test results were valid. Dr. Bathori also administered the Kaufman Functional Academic Skills Test ("K-FAST"), which measured reading and math skills. (AR 665.) During this exam, Plaintiff was able to read basic signage but could not decipher more difficult ones, and could read simple instructions but could not read more complex written instructions. The test yielded a standard score of between 54 and 59 out of a mean of 100, which put Plaintiff in the category of "Lower Extreme." (*Id.*) Finally, Dr. Bathori performed the CAST*MR to determine whether Plaintiff was competent to stand trial, and found that Plaintiff did not possess the ability to competently assist with counsel, understand the basic elements of the court, or follow proceedings. (AR 666.) Dr. Bathori concluded that Plaintiff met the criteria for moderate intellectual disability because her cognitive capacities, functional academic abilities, and adaptive functioning were very poor. (AR 667.)

Following a hearing, the ALJ rejected Plaintiff's application on June 25, 2015. (AR 6.) A request for review of the ALJ's decision was filed with the Appeals Council on July 16, 2015. (AR 5.) The Appeals Council denied Plaintiff's request for review on September 14, 2016. (AR 1.) On November 16, 2016, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). (Dkt. No. 1.)

On October 11, 2017, Plaintiff filed a motion for summary judgment. (Plf.'s Mot., Dkt. No. 18.) On November 7, 2017, Defendant filed an opposition and cross-motion for summary judgment. (Def.'s Opp'n, Dkt. No. 19.) On November 20, 2017, Plaintiff filed a reply brief. (Plf.'s Reply, Dkt. No. 20.)

## II. LEGAL STANDARD

A court may reverse the Commissioner's denial of disability benefits only when the Commissioner's findings are 1) based on legal error or 2) are not supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Tackett v. Apfel*, 180 F.3d 1094, 1097

(9th Cir. 1999). Substantial evidence is "more than a mere scintilla but less than a preponderance"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1098; *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). In determining whether the Commissioner's findings are supported by substantial evidence, the Court must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Id.* "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

Under SSA regulations, disability claims are evaluated according to a five-step sequential evaluation. *Reddick*, 157 F.3d at 721. At step one, the Commissioner determines whether a claimant is currently engaged in substantial gainful activity. *Id.* If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments," as defined in 20 C.F.R. § 404.1520(c). *Reddick*, 157 F.3d 715 at 721. If the answer is no, the claimant is not disabled. *Id.* If the answer is yes, the Commissioner proceeds to step three, and determines whether the impairment meets or equals a listed impairment under 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). If this requirement is met, the claimant is disabled. *Reddick*, 157 F.3d 715 at 721.

If a claimant does not have a condition which meets or equals a listed impairment, the fourth step in the sequential evaluation process is to determine the claimant's residual functional capacity ("RFC") or what work, if any, the claimant is capable of performing on a sustained basis, despite the claimant's impairment or impairments. 20 C.F.R. § 404.1520(e). If the claimant can perform such work, he is not disabled. 20 C.F.R. § 404.1520(f). RFC is the application of a legal standard to the medical facts concerning the claimant's physical capacity. 20 C.F.R. § 404.1545(a). If the claimant meets the burden of establishing an inability to perform prior work, the Commissioner must show, at step five, that the claimant can perform other substantial gainful work that exists in the national economy. *Reddick*, 157 F.3d 715 at 721. The claimant bears the burden of proof in steps one through four. *Bustamante*, 262 F.3d at 953-954. The burden shifts to

the Commissioner in step five. *Id.* at 954.

### III. THE ALJ'S DECISION

On June 25, 2015, the ALJ issued an unfavorable decision. (AR 9-21.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since April 30, 2013, the application date. (AR 11.) While Plaintiff had worked for the county school district in 2013 and 2014, the earnings of $729 in 2013 and $2,128 in 2014 were "not commensurate with substantial gainful activity on a mean monthly basis." (*Id.*)

At step two, the ALJ identified the following severe impairments: personality disorder, history of a language-related learning disorder, history of an organic brain disorder, borderline intellectual functioning, and an affective disorder. (AR 12.) The ALJ found that while Plaintiff initially alleged symptoms of bipolar disorder and schizophrenia, there was no probative evidence to support either.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (AR 12.) To satisfy the "paragraph B" criteria ("paragraph D" criteria of listing 12.05), the ALJ explained that the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation.

The ALJ found mild restrictions as to activities of daily living. (AR 12.) The ALJ pointed to Plaintiff's assertion that she could handle personal grooming, hygiene, and basic household chores such as preparing meals, shopping for food, washing dishes, and vacuuming. (AR 12-13.) In October 2014, Plaintiff was reported to be homeless primarily because she refused to follow her grandmother's rules. (AR 13.) Plaintiff also cared for her baby and took her baby to childcare until around April 2014. The ALJ noted that Plaintiff was unable to make change at the store.

The ALJ next found mild to moderate difficulties as to social functioning. For example, Plaintiff attended group instruction classes and mentoring, used public transportation, and could leave home alone. (AR 13.) In a October 2014 assessment, Plaintiff was found to have the capacity to start and handle conversations with peers and adults, and was described as a pleasant

and sociable lady who loved socializing and hanging out, with no emotional or behavioral concerns observed.

The ALJ found moderate difficulties as to concentration, persistence, or pace. (AR 13.) Plaintiff was able to use public transportation but could not make change. She was enrolled in coursework until at least April 2010, with the goal of enrolling in community college. Plaintiff was assessed in October 2014 to be able to perform basic functional academic tasks, including answering personal information, copying from a written model, and performing simple math problems. She was also assessed to be able to perform basic job-related tasks.

Finally, the ALJ found no episodes of decompensation. (AR 13.) Thus, because there were not two "marked" limitations or one "marked" limitation and repeated episodes of decompensation, the "paragraph B" criteria ("paragraph D" criteria of listing 12.05) were not satisfied.

The ALJ also considered whether Plaintiff satisfied the "paragraph B" criteria of listing 12.05, which required a valid verbal, performance, or full scale IQ of 59 or less. (AR 15.) The ALJ concluded that she did not, explaining that although Dr. Kollath's test results from September 2012 reflected a full scale IQ of 44, a verbal IQ of 51, and a performance IQ of 53, the results were considered unreliable and therefore invalid. Likewise, Dr. Prosise's October 2013 test resulted reflected a full scale IQ of 53, verbal IQ of 56, and performance IQ of 79, but the results were deemed "invalid due to willful item rejections and naively inventive errors." (*Id.*) The ALJ then noted that Dr. Bathori's June 2014 results reflected a full scale IQ of 47, verbal IQ of 61, and performance IQ of 50. While the ALJ acknowledged that Dr. Bathori had felt the results were valid, the ALJ found them unreliable, explaining that "[w]hile borderline intellectual functioning is at least partially supported by the record, pervasive malingering and abilities beyond a disabling intellectual impairment are preponderantly supported by the record . . . ." (*Id.*) Therefore, the ALJ concluded that Plaintiff had not satisfied the "paragraph B" criteria of listing 12.05.

At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with certain non-exertional limitations. (AR 15.) Specifically, Plaintiff could engage in one to two-step tasks in a low stress job

8

environment requiring only occasional decision-making, occasional changes in the work setting, and occasional exercise of judgment. Additionally, Plaintiff should not work in fast-paced production rate work or interact with the public. In making this finding, the ALJ noted that Plaintiff had testified that her grandmother helped her take care of her two-year old child, and that she could shop, prepare meals for her child, dress her child, and bathe her child. (AR 16.) Plaintiff worked at the YMCA through a school program as a janitor, and had testified that she liked her work and wanted to work in a fast food restaurant. Plaintiff had a phone that she used to text and talk to her friends every day. Plaintiff's grandmother testified that the claimant needed to be reminded to go to the bathroom and to shower, and that Plaintiff wanted her own place but that Plaintiff's grandmother did not believe she was ready for that.

The ALJ ultimately found that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms and limitations, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms was not entirely credible. (AR 16.) The ALJ cited to Dr. Davis's evaluation from June 2008, which opined that Plaintiff continued to meet the eligibility criteria for the special education program, and recommended that Plaintiff continue with the special day class, non-severely handicapped program or transfer to a program to teach her basic living skills and appropriate work behavior. (AR 16-17.) The ALJ did not otherwise address the validity of Dr. Davis's evaluation.

The ALJ then reviewed several medical opinions. The ALJ gave partial weight to Dr. Kollath's opinion that Plaintiff was unimpaired except as to complex or detailed instructions and tasks, finding that "the record as a whole supports more than minimal limitations with the abilities to maintain concentration, persistence and pace." (AR 17.) The ALJ noted that Dr. Vasser had concluded that Plaintiff presented with severe receptive or expressive language delays, but did not explain what weight was given to Dr. Vasser's opinion. (*Id.*)

The ALJ also reviewed an April 2013 report in which Plaintiff was evaluated and treated for depressive symptoms for approximately three months. (AR 17.) Statia Tell, a nurse, assessed Plaintiff with depression. Plaintiff gave Nurse Tell a form that she needed filled out for supplemental security income. In July 2013, Plaintiff returned with a form from her lawyer

regarding supplemental security income, which Nurse Tell filled out. Nurse Tell stated that she did not believe Plaintiff was incapable of working, except that she might have fundamental coping problems with life. (*Id.*; *see also* AR 430.) The ALJ gave much weight to Nurse Tell's opinion that Plaintiff was not incapable of working. (AR 17.)

Next, the ALJ considered Dr. Prosise's opinion that Plaintiff was minimally impaired with adaptation as to complex tasks and decisions, and otherwise unimpaired. (AR 17-18.) The ALJ gave Dr. Prosise's opinion partial weight because it was supported by and generally consistent with Dr. Kollath's findings and opinion. (AR 18.) The ALJ then noted that in October 2013, the state agency psychological consultant found there was insufficient evidence from which to determine disability because of Plaintiff's failure to cooperate during Dr. Prosise's evaluation, and explained that Plaintiff had failed to cooperate during psychometric testing and was clearly malingering. While the consultant thought Plaintiff might have significant psychiatric symptoms, there was no acceptable medical source opinion in the record. In January 2014, another state agency psychological consultant affirmed the initial determination. The ALJ agreed with the consultants' conclusions but found there was evidence of medically determinable impairments diagnosed by acceptable medical sources.

Finally, the ALJ reviewed Dr. Bathori's opinion that Plaintiff was incompetent to stand trial and met the criteria for moderate intellectual disability. (AR 18.) The ALJ found, however, that an assessment counselor, a physician, and psychologist reviewed Plaintiff's eligibility for services in July 2014 and found that she was eligible for services based on having a mild intellectual disability. Moreover, the ALJ explained that the degree of intelligence needed to stand trial was beyond that necessary to do simple, repetitive, one to two step tasks necessary for an unskilled occupation, and that this conclusion was bolstered by Plaintiff's testimony that she understood her training as a janitor and was doing her job well. (*Id.*)

Overall, the ALJ concluded that the RFC was supported by a preponderance of the objective evidence of record while giving Plaintiff's "self-described limitations and symptoms a constrained yet reasonable benefit of the doubt." (AR 19.) The ALJ explained that Plaintiff's activities over the last five to ten years were not as limited as one would expect given the alleged

10

1  disabling symptoms and limitations, and noted that Plaintiff had provided inconsistent information
2  regarding daily activities. (*Id.*) Further, Plaintiff had not received the type of medical treatment
3  that would be expected for a totally disabled individual. Finally, the ALJ found that there was
4  "tolerably clear evidence that [Plaintiff] has consciously attempted to portray limitations tha[t] are
5  not actually present in order to increase the chance of obtaining benefits." (*Id.*)

6  At step five, the ALJ found there were jobs in significant numbers that Plaintiff could
7  perform. (AR 19.) During the hearing, the vocational expert ("VE") had testified that an
8  individual with Plaintiff's age, education, work experience, and RFC could perform unskilled
9  occupations such as a cook helper, hospital cleaner, kitchen helper, and janitor. (AR 20.) Based
10 on the number of available jobs, the ALJ concluded that Plaintiff was not disabled. (*Id.*)

**IV.  DISCUSSION**

Plaintiff challenges the ALJ's decision on four grounds. First, Plaintiff argues that the ALJ failed to consider Dr. Davis's opinion without providing specific and legitimate reasons. (Plf.'s Mot. at 14.) Second, Plaintiff contends the ALJ did not provide a legitimate reason for discrediting Dr. Bathori's testing and diagnosis. (*Id.*) Third, Plaintiff argues that by ignoring the testing results of Dr. Prosise, Dr. Kollath, and Dr. Bathori, the ALJ had no IQ test results by which to evaluate a claim of intellectual disability, and was therefore required to develop the record by ordering additional testing. (*Id.* at 14-15.) Finally, Plaintiff contends that there is no evidence in support of the RFC. (*Id.* at 15-16.)

**A.  Dr. Davis Opinion**

Plaintiff argues that the ALJ failed to consider Dr. Davis's 2008 evaluation without providing a specific and legitimate reason for rejecting it. (Plf.'s Mot. at 14.) Plaintiff argues that this is error because Plaintiff's scores from Dr. Davis's evaluation would have been equal to a full scale IQ of 52, which would be below the score of 59 needed to qualify for social security based on the "paragraph B" criteria for listing 12.05. (*Id.* at 7.) Defendant responds that the ALJ did mention Dr. Davis's report, and that Dr. Davis's finding that Plaintiff qualified for special education services was consistent with the ALJ's finding that Plaintiff had severe impairments including borderline intellectual functioning and learning disability. (Def.'s Opp'n at 7-8.)

Defendant also argues that the report was not significant, probative evidence requiring discussion because Plaintiff was fourteen years old at the time of Dr. Davis's report, and the report came almost five years before the relevant period for Plaintiff's social security application. (*Id.* at 8.)

The Court agrees with Defendant that the ALJ was not required to discuss Dr. Davis's report and explain why the report was rejected. The Ninth Circuit has found that the Secretary "need not discuss *all* evidence presented to her. Rather, she must explain why significant probative evidence has been rejected." *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (internal quotation omitted). Applying *Vincent*, the district court in *Hansen v. Astrue* found that an opinion from nearly two years before the relevant period "was neither significant nor probative, and the ALJ was not required to consider it." 6:11-cv-6204-TC, 2012 WL 3044262, at *3 (D. Ore. June 19, 2012). Here, Dr. Davis's report preceded the relevant period by five years. The Court thus concludes that it was not significant, probative evidence, and thus the ALJ did not have to explain why it was rejected.

### B. Dr. Bathori Opinion

Plaintiff argues that the ALJ did not provide a legitimate reason for discrediting Dr. Bathori's testing and opinion because the ALJ only stated that the testing was done to determine competency to withstand trial. (Plf.'s Mot. at 14.) Defendant responds that the ALJ rejected Dr. Bathori's opinion because there was evidence of malingering and was contradictory to Plaintiff's activities. (Def.'s Opp'n at 15.) Plaintiff, in turn, contends that this was not the reason given by the ALJ. (Plf.'s Reply at 6.)

The Court disagrees with Plaintiff. In the ALJ's discussion of whether Plaintiff had an impairment or combination of impairments that equaled a listed impairment, the ALJ specifically explained that the ALJ did not believe Dr. Bathori's test results were valid in light of "the opinions of the two psychologists in September 2012 [Dr. Kollath) and October 2013 [Dr. Prosise], as well as the record as a whole."[1] (AR 15.) The ALJ went on to state that the test results were

---

[1] Although the ALJ refers to the "April 2014" results, when Dr. Bathori's examination occurred in June 2014, the reference is clearly to Dr. Bathori's opinion as the ALJ cites to the correct exhibit and describes the results found by Dr. Bathori. (*Compare* AR 15 *with* AR 664.)

12

unreliable, and while there was evidence of borderline intellectual functioning, "pervasive malingering and abilities beyond a disabling intellectual impairment are preponderantly supported by the record . . . ." (*Id.*) In short, the ALJ's rejection of Dr. Bathori's test results was not limited to the fact that Dr. Bathori's examination was conducted, in part, to determine whether Plaintiff was competent to stand trial; the ALJ also rejected the results because of the previous findings of malingering and Plaintiff's abilities. (*Id.*) The Court finds that the ALJ provided legitimate reasons for rejecting Dr. Bathori's findings and examination results.

### C. Record Development

Next, Plaintiff argues that because the ALJ rejected the testing results of Dr. Prosise, Dr. Kollath, and Dr. Bathori, the ALJ should have developed the record by requiring a valid psychological test. (Plf.'s Mot. at 14-15.) In support, Plaintiff relies on *Garcia v. Commissioner of Social Security*, in which the Ninth Circuit found that the ALJ had a duty to order further IQ testing where the record did not include a complete set of valid IQ scores. 768 F.3d 925, 926 (9th Cir. 2014). There, a psychologist had administered the WAIS-III exam, which measures an individual's IQ based on three scores: verbal, performance, and full scale. *Id.* at 927. The psychologist, however, administered only the performance portion of the WAIS-III due to time constraints and how slowly the plaintiff worked. *Id.* Thus, the psychologist did not report a verbal or full-scale IQ score, and instead provided only the performance IQ score. *Id.* Based on the incomplete IQ test results, a second psychologist and a physician both opined that Plaintiff was moderately limited. *Id.* at 928.

The Ninth Circuit concluded that "[i]t was legal error for the ALJ not to ensure that the record included a complete set of IQ test results that both the ALJ and the reviewing experts could consider." *Garcia*, 768 F.3d at 929. The Ninth Circuit explained that where the case turned on whether the claimant had an intellectual disability and IQ scores were relied upon for the purpose of assessing disability, a fully and fairly developed record had to include a complete set of IQ scores that reported verbal, non-verbal, and full-scale abilities. *Id.* at 930-31. This was because IQ testing was particularly important in assessing whether there was an intellectual disability, and could affect the development of other evidence in the record. *Id.* at 931. Further, the Ninth

13

1 Circuit observed that the SSA itself had determined that it was essential to have a complete set of
2 IQ scores for evaluating intellectual disability. *Id.* Thus, given "the importance of a complete IQ
3 test administration, the ALJ had a duty to develop the record so that it included a complete set of
4 IQ test results." *Id.* at 932.

5       The instant case is distinguishable from *Garcia* because this is not a case in which no
6 complete IQ test results were included in the record. Rather, several complete sets of IQ test
7 results were included. The ALJ, however, found that the test results were unreliable because of
8 Plaintiff's malingering on two separate occasions. (*See* AR 15.) Thus, the ALJ's findings were
9 based not on an incomplete set of IQ test results, but a rejection of those test results as being
10 tainted by Plaintiff's actions during the testing itself. The Court therefore finds that *Garcia* is not
11 applicable in this case, and that the ALJ was not required to send Plaintiff out for additional
12 testing.

### D. Basis for the RFC

14       Finally, Plaintiff argues that the ALJ's RFC was not supported by substantial evidence
15 because the ALJ had already discounted Dr. Bathori's evaluation, failed to consider Dr. Davis's
16 testing, and considered Dr. Prosise's and Dr. Kollath's test results to be invalid. (Plf.'s Mot. at 16.)
17 Defendant replies that the RFC was supported by Dr. Prosise's and Dr. Kollath's opinions, as well
18 as the statement by Nurse Tell that Plaintiff was capable of working. (Def.'s Opp'n at 6-7.)
19 Plaintiff responds that Dr. Prosise's and Dr. Kollath's opinions do not have sufficient basis to be
20 substantial medical evidence because their testing was invalid, their interview was unreliable, and
21 they had only reviewed a few pages of a disability report. (Plf.'s Reply at 6-7.)

22       The Court finds that the ALJ's RFC was supported by substantial evidence. Plaintiff's
23 argument is primarily that because the ALJ found Dr. Prosise's and Dr. Kollath's test results
24 invalid, their entire opinions lack merit. The Court rejects this argument. Dr. Kollath, for
25 example, based her results not only on the mental status examination, but the clinical interview
26 and medical records. (AR 407, 409.) With respect to the clinical interview, while Dr. Kollath
27 found that Plaintiff was an unreliable historian, the interview allowed Dr. Kollath to observe
28 Plaintiff, as she observed that Plaintiff was friendly, cooperative, made good eye contact, had

14

normal facial expressions, and interacted appropriately with the examiner and office staff. (AR 406.) Similarly, while the test results were invalid, Dr. Kollath observed Plaintiff to be presenting with suboptimal efforts, and that her answers were "congruent with what is seen in a malingering profile." (AR 407-08.) Dr. Kollath also found that Plaintiff had no difficulty following simple and moderately complex directions. (AR 408.) Such observations about Plaintiff's behavior during the clinical interview and the testing process itself support Dr. Kollath's opinions, even if the test results themselves were invalid and Plaintiff was an unreliable historian.

Similarly, Dr. Prosise conducted both a clinical interview and examinations, and reviewed Plaintiff's records. (AR 432-33.) During the interview, Dr. Prosise observed Plaintiff as understanding the questions, responding cooperatively to informal prompts but failing to comply with testing, being attentive and communicative, and having intact concentration. (AR 432.) During the tests, Dr. Prosise explained that Plaintiff's answers included "implausible item failures," and observed Plaintiff as "st[anding] by her errors or escalat[ing] them blatantly, with discreet amusement." (AR 433.) Dr. Prosise also found that Plaintiff's test results on the Rey-15 "showed transparently willful, provocative errors." (AR 433.) Finally, Dr. Prosise observed Plaintiff as adopting a misleading stance that she "quietly enjoyed," "in which she portrayed herself with improvised cognitive impairment." (AR 434.) Again, such observations supported Dr. Prosise's opinions, even if he ultimately found the test results to be invalid due to Plaintiff's malingering.

Additionally, the ALJ relied on Nurse Tell's belief that Plaintiff was not "[i]ncapable of working," as well as Plaintiff's daily activities being inconsistent with the alleged disabling symptoms and limitations. (AR 17, 19.) The ALJ further observed that Plaintiff's ability to do simple, repetitive, one to two step tasks equating to an unskilled occupation was "bolstered by [Plaintiff's] testimony that she understood her training as a janitor and report[ed] that she was doing her job well." (AR 18.) The ALJ also noted that Plaintiff had not received the type of medical treatment one would expect for a totally disabled individual. *See Molina v. Astrue*, 674 F.3d 1104, 1113-14 (9th Cir. 2012) ("a claimant's failure to assert a good reason for not seeking treatment . . . can cast doubt on the sincerity of the claimant's . . . testimony"). Taken together, the

Court finds that the ALJ's RFC was supported by substantial evidence.

## V. CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment is DENIED, and Defendant's cross-motion for summary judgment is GRANTED. The Clerk shall close the case.

IT IS SO ORDERED.

Dated: March 16, 2018

_____
KANDIS A. WESTMORE
United States Magistrate Judge